MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: JEFF ALBERTS
    BARBARA A. WARD
    KATHLEEN ZEBROWSKI
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Tel. (212) 637-1038/1048/2710



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,         :

        Plaintiff,        :

      - v. -        :

TODD EBERHARD and SANDI EBERHARD,    :

        Defendants, and    :

The Net Proceeds from the Sale of John Pye Island,  :
an Unoccupied Island Lying and Being at Spanish
Ship Bay, Guysborough County, Nova Scotia, and  :
Being Designated John Pye's Island on Plan of
Survey #6532 Prepared by Lester W. Berrigan, Nova  :
Scotia Land Surveyor: #409 Dated the 12th Day of
May, 1998, on Deposit at Citibank, N.A. in the  :
Name of Aaron R. Marcu in his Capacity As
Receiver for the Assets of Todd Eberhard, and All  :
Interest and Other Proceeds Traceable Thereto;

        :

All Right, Title and Interest in any and all Shares of
Borderline Development NS, Inc., a Nova Scotia  :
Corporation, Currently Held by Aaron R. Marcu in
his Capacity As Receiver for the Assets of Todd  :
Eberhard, and all Proceeds Traceable Thereto;

        :

All Right, Title and Interest in the Real Property and
Appurtenances in or near the Apartment Building  :
Located at 2251-65 d'Ilberville Street, Montreal,

AMENDED
VERIFIED COMPLAINT

08 Civ. 5622 (RMB)

Quebec, Canada, Listed as Lot Number 1,425,110 of  :
the Cadastre of Quebec, in the Land Registry of
Montreal; and                                       :

All Right, Title and Interest in the Real Property and  :
Appurtenances in or near the Apartment Building
Located at 1727-39 Shevchenko Boulevard, Lasalle,  :
Quebec, Canada, listed as Lot Number 499225 of the
Cadastre of Quebec, Montreal Registry Office and   :
Lot Number 1499267 of the Cadastre of Quebec,
Montreal Registry Office,                           :

And all property traceable thereto,                 :

       Defendants in Rem.                  :

                                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff United States of America, by its attorney, Michael J. Garcia, United States

Attorney for the Southern District of New York, for its complaint alleges, upon information and

belief, as follows:

## I. JURISDICTION AND VENUE

1.      This action is brought by the United States of America seeking, pursuant to 18

U.S.C. §§ 981(a)(1)(C) and 984, the forfeiture of all right, title and interest in:

    a.     The net proceeds from the sale of John Pye Island, an unoccupied island lying and
          being at Spanish Ship Bay, Guysborough County, Nova Scotia, and being
          designated John Pye's Island on plan of survey #6532 prepared by Lester W.
          Berrigan, Nova Scotia Land Surveyor #409 dated the 12th day of May, 1998, on
          deposit at Citibank, N.A. in the name of Aaron R. Marcu in his capacity as
          receiver for the assets of Todd Eberhard, and all interest and other proceeds
          traceable thereto (the "Island Proceeds");

    b.     All Right, Title and Interest in any and all Shares of Borderline Development NS,
          Inc., a Nova Scotia Corporation ("Borderline NS"), currently held by Aaron R.

Marcu in his capacity as receiver for the assets of Todd Eberhard, and all interest and other proceeds traceable thereto (the "Borderline NS Shares");

c.     All right, title and interest in the real property and appurtenances in or near the apartment building located at 2251-65 d'Ilberville Street, Montreal, Quebec, Canada, listed as Lot Number 1,425,110 of the Cadastre of Quebec, in the Land Registry of Montreal ("d'Ilberville Property"); and

d.     All right, title and interest in the real property and appurtenances in or near the apartment building located at 1727-39 Shevchenko Boulevard, Lasalle, Quebec, Canada, listed as Lot Number 499225 of the Cadastre of Quebec, Montreal Registry Office and Lot Number 1499267 of the Cadastre of Quebec, Montreal Registry Office ("Shevchenko Property"),

And all property traceable thereto,

(hereinafter referred to collectively as the "Defendants in Rem").  Forfeiture is sought on the grounds that the Defendants in Rem constitute or are derived from proceeds traceable to mail fraud, in violation of 18 U.S.C. § 1341; and wire fraud, in violation of 18 U.S.C. § 1343.

2.     The Island Proceeds consist of $79,872.60 on deposit at Citibank, N.A., New York, New York, in Account No. 44768847 in the name of Aaron R. Marcu, Receiver for Eberhard Assets.

3.     The Borderline NS Shares consist of a stock certificate for which Aaron R. Marcu, Receiver, is the registered owner.  This certificate is held by the registered agent, Robert G. MacKeigan, 1000-1959 Upper Water Street, Halifax, Nova Scotia, B3J 3N2.

4.     Borderline NS is the owner of record of the Defendant in Rem apartment buildings.

5.     The United States of America also brings this action pursuant to 28 U.S.C. §§ 3301, *et seq.*, to collect upon the judgment entered in *United States v. Todd M. Eberhard*, S1

3

03 Cr. 562 (RWS) (the "Judgment") by setting aside, as a fraudulent conveyance, the conveyance of property by Todd Eberhard to Sandi Eberhard.

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

7.    Venue for the forfeiture claim is proper pursuant to 28 U.S.C. § 1355 because acts and omissions giving rise to the forfeiture occurred in the Southern District of New York.

8.    Venue for the fraudulent conveyance claim is proper under 28 U.S.C. § 1391 because the Judgment giving rise to this action was entered by the United States District Court for the Southern District of New York.

## II. PARTIES

9.    The plaintiff United States is a sovereign and body politic.

10.    The defendant Todd Eberhard ("Eberhard") resides at the United States Penitentiary, Lewisburg, Pennsylvania, the address of which is U.S. Penitentiary, 2400 Robert F. Miller Drive, Lewisburg, PA 17837.

11.    The defendant Sandi Eberhard is the mother of Todd Eberhard and resides at 433 Verbank Road, Milbrook, New York, 12545.

## II. STATEMENT OF FACTS

12.    On August 12, 2004, as a result of an investigation conducted by the United States Postal Inspection Service, the United States Securities and Exchange Commission ("SEC"), and the United States Attorney's Office for the Southern District of New York, a federal grand jury in the Southern District of New York returned Indictment S1 03 Cr. 562 (RWS) (the "Indictment") charging Eberhard with conspiracy to commit mail fraud, wire fraud, and investment advisor

fraud, in violation of 18 U.S.C. § 371 (Count One); investment advisor fraud, in violation of 15

U.S.C. §§ 80(b)-6 and 80b-17 (Counts Two through Eight); wire fraud, in violation of 18 U.S.C.

§§ 1343 and 1346 (Counts Nine through Eleven); mail fraud, in violation of 18 U.S.C. §§ 1341

and 1346 (Counts Twelve through Fourteen); witness tampering, in violation of 18 U.S.C.

§ 1512(b) (Count Fifteen); and obstruction of justice, in violation of 18 U.S.C. § 1512(c) (Count

Sixteen). A copy of the Indictment is attached hereto as Exhibit A and is incorporated herein by

reference as if set out in full.

13.    The Indictment charged, in pertinent part, that:

a.    Between in or about 1993 and in or about May 2003, Eberhard engaged in a

scheme to defraud certain clients for whom he provided investment advisory and securities

brokerage services. Eberhard misappropriated funds entrusted to him by his clients through a

variety of means, including "churning" their accounts to generate millions of dollars in

commissions and compensation for himself and his firms, and by making millions of dollars'

worth of unauthorized and improper withdrawals and transfers from client accounts.

(Indictment, ¶¶ 6-14).

b.    Eberhard used the millions of dollars of misappropriated client funds for a host of

improper purposes, including: (i) his own personal use; (ii) paying his employees exorbitant

salaries; (iii) making payments to former clients who had complained about Eberhard's

fraudulent conduct to law enforcement or securities regulatory authorities; and (iv) paying certain

individuals to prevent them from acting on threats to expose Eberhard's fraudulent conduct to

law enforcement, and from exposing to Eberhard's wife the fact that he had engaged in intimate

relationships with other women.  (Indictment, ¶¶ 6, 15-21).

5

c.    After Eberhard's arrest in February 2003, Eberhard continued to conspire to retain the proceeds of his fraud by persuading two of his clients to execute a back-dated document that purported to transfer the ownership interest in (but not the income produced by) certain real property from Eberhard to the clients. This document was subsequently submitted to the SEC in connection with Eberhard's efforts to have that real property excluded from an asset freeze, discussed further below, that had been put in place with respect to all of Eberhard's personal assets. (Indictment, ¶¶ 30-34).

14.    At all times relevant to the allegations of the Indictment, Eberhard lived and worked in New York, New York. Eberhard's fraudulent conduct was conducted by, *inter alia*, the use of intrastate and interstate wire communications, including, but not limited to, telephone, facsimile and electronic mail, and the United States Mail.

15.    Eberhard obtained substantial illegal sums as a result of this scheme. For example, during the period of approximately 1998-2001, Eberhard earned an average of approximately $400,000 per month in commissions alone, through the churning of client accounts.

16.    During the course of the investigation, authorities learned that Eberhard had used a portion of the proceeds of his fraud to make numerous real estate investments in the United States and abroad:

a.    Between late 1998 and late 2001, Eberhard received at least $16,044,071.26 in payments from Clearing Services of America Inc. ("CSA") arising out of his unlawful, fraudulent activities with that brokerage firm. In 2002, he received at least $4,494,334.60 in payments from CSA and Park South Securities LLC arising out of his unlawful, fraudulent activities with those

6

firms. These payments were deposited into a checking account at Dime Savings Bank ("Dime Account"). The sum of these two amounts, $20,538,405.86, represents the overwhelming majority of all funds deposited into the Dime Account during those time periods. The total dollar volume of deposits into the Dime Account between 1999 and 2002 was approximately $25.5 million.

b.    Eberhard established Borderline NS, which he wholly owned and controlled, in or about April 2000.

c.    Eberhard caused Borderline NS to acquire Pye Island on or about April 17, 2000. He used at least $51,232.49 of proceeds from the Dime Account to make this acquisition. Eberhard also used at least $1,800 of proceeds from the Dime Account to pay maintenance costs for this property.

d.    Eberhard caused Borderline NS to acquire the Shevchenko Property on or about May 10, 2001. He used $1,500 of proceeds from the Dime Account to pay a deposit for this purchase, and $390,000 in proceeds from a loan from Farmers and Merchants Bank of Eatonton, Georgia ("FMB") to complete the purchase at closing. Eberhard used proceeds from the Dime Account to pay the principal and interest due on the loan from FMB.

e.    Eberhard caused Borderline NS to acquire the d'Iberville Property on or about August 13, 2001. He used $305,433.34 in proceeds from a loan extended by FMB to complete the purchase at closing. Eberhard used proceeds from the Dime Account to pay the principal and interest due on the loan from FMB.

17.     Eberhard pleaded guilty on or about September 14, 2004, pursuant to a plea agreement, to conspiring to commit mail, wire and investment advisor fraud, in violation of 18 U.S.C. § 371 (Count One); investment advisor fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17 (Counts Two through Eight); wire fraud, in violation of 18 U.S.C. § 1343 (Count Eleven); mail fraud, in violation of 18 U.S.C. § 1341 (Count Twelve); and obstruction of justice, in violation of 18 U.S.C. § 1512 (Count Sixteen).

18.     Eberhard ultimately was sentenced to a term of imprisonment and ordered to pay restitution in the amount of $19,870,412.66.

19.     In or about February 2003, following Eberhard's arrest, the SEC sued Eberhard and his affiliated entities and obtained a temporary restraining order.  In connection with the SEC action, *SEC v. Eberhard, et al.*, No. 03 Civ. 813 (RMB), the United States District Court for the Southern District of New York ordered Eberhard to provide a list of all assets belonging to him and his affiliated entities, and ordered that all such assets be frozen so that they could be preserved for later distribution to victims of his fraud (the "Freeze Order").  In connection with the Freeze Order, the Court appointed Aaron Marcu, Esq., to serve as the Receiver of Eberhard's assets (the "Receiver").

20.     The Defendants in Rem constitute property of Eberhard over which the Receiver has taken custody or control.  The Island Proceeds consists of the proceeds from the sale of John Pye Island.  The two apartment buildings in Montreal have not yet been liquidated, but the Receiver has taken custody and control of the stock certificate representing all the shares of Borderline NS, the owner of record of the buildings.

8

21.    Upon entry of a final order forfeiting the Defendants in Rem to the United States, it is the intention of the United States Attorney's Office to request that the forfeited property be applied to the order of criminal restitution that has been imposed against Eberhard and distributed *pro rata* to the victims of the fraud.

### III.  FIRST CAUSE OF ACTION

22.    Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in all preceding paragraphs of this Amended Verified Complaint.

23.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in Section 1956(c)(7) of [title 18]), or a conspiracy to commit such offense," is subject to forfeiture to the United States.

24.    "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7), and the term includes any offense listed under 18 U.S.C. § 1961(1).  Section 1961(1) lists, among other offenses, violations of 18 U.S.C. § 1341 (relating to mail fraud), and violations of 18 U.S.C. § 1343 (relating to wire fraud).

25.    Title 18, United States Code, Section 984 provides, in pertinent part, that

> (a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals –

> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

26.    The Defendants in Rem are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe that they constitute or are derived from proceeds traceable to offenses constituting specified unlawful activity, to wit, mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

27.    Title 21, United States Code, Section 853(i), which is applicable to forfeitures under 18 U.S.C. § 981(a)(1)(C), provides in pertinent part:

With respect to property ordered forfeited under this section, the Attorney General is authorized to--

(1) grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this subchapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section. . . .

28.    By reason of the foregoing, the Defendants in Rem became and are subject to forfeiture to the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984.

WHEREFORE, Plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants in Rem and that all persons having an interest in the Defendants in Rem be required to appear and show cause why the forfeiture of the Defendants in Rem should

not be decreed, that this Court decree forfeiture of the Defendants in Rem to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as it may deem just and proper, together with the costs and disbursements of this action.

## IV.  SECOND CAUSE OF ACTION

29.     Plaintiff repeats, realleges and incorporates by reference herein each and every allegation contained in all preceding paragraphs of this Amended Verified Complaint.

30.     Plaintiff brings this second cause of action against the defendants Todd Eberhard and Sandi Eberhard pursuant to the Federal Debt Collection Procedure Act, 28 U.S.C. §§ 3301, *et seq.*, to collect upon the Judgment by setting aside, as a fraudulent conveyance, the conveyance of certain property by Todd Eberhard to Sandi Eberhard.

31.     Prior to June 22, 2002, Todd Eberhard was the sole shareholder of Borderline NS.

32.     On or about June 22, 2002, Todd Eberhard transferred, conveyed and/or delivered to Sandi Eberhard all shares of Borderline NS.

33.     The conveyance alleged in paragraph 32 by Todd Eberhard to Sandi Eberhard was fraudulent as to the United States, in that the conveyance was made with actual intent to hinder, delay or defraud the United States.

34.     The conveyance alleged in paragraph 32 by Todd Eberhard to Sandi Eberhard was fraudulent as to the United States, in that the conveyance was made without consideration and in that Todd Eberhard intended to incur or believed, or reasonably should have believed, that he would incur debts beyond his ability to pay as they became due.

35.     The conveyance alleged in paragraph 32 was made or contrived with the purpose and effect of avoiding debts belonging to Todd Eberhard's creditors, including the United States,

and is null and void as a fraudulent conveyance under the Federal Debt Collection Procedure Act, 28 U.S.C. § 3301, *et seq.*, and sections 273 and 276 of the New York Debtor and Creditor Law.

WHEREFORE, the plaintiff United States of America, prays:

a.    That the conveyance described in paragraph 32 be set aside as a fraudulent conveyance.

b.    That the United States be awarded a judgment against the transferee, defendant Sandi Eberhard, for the amount outstanding under the restitution judgment.

c.    That the plaintiff be awarded its costs, fees, and disbursements.

d.    That the Court order such other relief as may be just.

Dated:  New York, New York
        July 17, 2008

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America


By: _____
    JEFF ALBERTS
    BARBARA A. WARD
    KATHLEEN ZEBROWSKI
    Assistant United States Attorneys

12

VERIFICATION

STATE OF NEW YORK                    )
COUNTY OF NEW YORK                   )
SOUTHERN DISTRICT OF NEW YORK   )

      Pankaj Sharma, being duly sworn, deposes and says that he is a Postal Inspector

employed with the United States Postal Inspection Service and as such has responsibility for the

within action; that he has read paragraphs one through twenty-eight of the foregoing Amended

Verified Complaint and knows the contents thereof, and that the same are true to the best of his

own knowledge, information and belief.

      The sources of deponent's information and the ground of his belief are official records

and files of the United States and information obtained directly and indirectly by deponent during

an investigation of alleged violations of Titles 15 and 18, United States Code.

 

Pankaj Sharma
Postal Inspector
United States Postal Inspection Service

Sworn to before me this
17th day of July, 2008:

**STEVEN YAGODA**
Notary Public - State of New York
No. 01YA6187396
Qualified in Nassau County
My Commission Expires May 19, 20 1

# EXHIBIT
# A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

       -v.-                                    :    **INDICTMENT**

TODD M. EBERHARD,                           :    S1 03 Cr. 562 (RWS)

                Defendant.

                      :

- - - - - - - - - - - - - - - - - - x

## COUNT ONE

(Conspiracy)

The Grand Jury charges:

### Relevant Persons and Entities

1.    At all times relevant to this Indictment, TODD M. EBERHARD, the defendant, purported to be in the business of providing investment advice to, and managing the funds of, individual investors.  EBERHARD held Series 7, 24, 63 and 65 licenses with NASD, and, at various times relevant to this Indictment, was registered with NASD as a general securities principal and representative.

2.    At all times relevant to this Indictment, Eberhard Investment Associates and its predecessor entity, Eberhard Investment Advisers (collectively "EIA"), were entities incorporated and located in the State of New York through which TODD M. EBERHARD purported to render investment advice for the trading of securities and general advice regarding investment

strategies and financial planning for the accounts of EBERHARD's clients. At all times relevant to this Indictment, EBERHARD was the President of EIA. Because EIA was not a securities broker-dealer, it entered into relationships with securities broker-dealers to enable EIA to place securities transactions and otherwise manage the funds clients entrusted to it. The securities broker-dealers with which EIA was affiliated included the following:

a. From in or about 1993 through in or about 1998, EIA maintained relationships with the following entities, in succession, all of which were securities broker-dealers registered with the SEC and members of the NASD: (1) Nathan & Lewis Securities Inc. ("Nathan & Lewis"), located in New York, New York; (2) Linsco/Private Ledger ("LPL"), located in San Diego, California; and (3) Royal Alliance Associates, Inc. ("Royal Alliance"), located in New York, New York. TODD M. EBERHARD was registered as a general securities representative employed by Nathan & Lewis and LPL, and as both a general securities representative and general securities principal employed by Royal Alliance. Because of EBERHARD's excessive and improper trading activity, described more fully below, Nathan & Lewis, LPL and Royal Alliance each terminated its relationship with EIA and EBERHARD.

2

b.  From in or about November 1998 through in or about December 2001, EIA used the brokerage services of Clearing Services of America, Inc. ("CSA"), a securities broker-dealer registered with the SEC and a member of NASD.  EBERHARD was registered both as a general securities principal and a general securities representative employed by CSA.

3.  At all times relevant to this Indictment, Park South Securities, LLC ("Park South") was a limited liability company organized under the laws of the State of New York with several places of business, including one in New York, New York. Park South was registered with the SEC as an Investment Adviser and a securities broker-dealer.  From in or about July 1999 through at least in or about February 2003, TODD M. EBERHARD was Chairman of the Board and part owner of Park South.  In or about late 2001, EBERHARD caused his clients' accounts to be transferred from CSA to Park South.

4.  At all times relevant to this Indictment, Park South used the clearing services of Correspondent Services Corporation ("CSC"), an entity owned and controlled by UBS Paine Webber and located in Weehawken, New Jersey.  CSC, in its capacity as Park South's clearing broker, provided a number of services for Park South clients, including the issuance of monthly account statements.

3

5.    At all times relevant to this Indictment, Powell Transactions, Ltd. ("Powell Transactions"), was an entity incorporated in the State of New York with its principal place of business at EIA's address.  TODD M. EBERHARD was the Chief Executive Officer and owner of Powell Transactions, which EBERHARD used to conduct certain of his personal affairs, including the purchase of real estate.  Powell Transactions was not an entity through which EBERHARD conducted investment advisory business nor with which EIA account-holders had a client relationship.

**THE SCHEME TO DEFRAUD**

6.    From at least in or about 1993, through in or about May 2003, TODD M. EBERHARD, together with others known and unknown, engaged in a scheme to defraud certain clients for whom he provided investment advisory and securities brokerage services.  As part of the scheme, EBERHARD misappropriated funds entrusted to him by his clients through a variety of means, including "churning" their accounts to generate millions of dollars in commissions and compensation for himself and his firms, and by making millions of dollars' worth of unauthorized and improper withdrawals and transfers from client accounts. EBERHARD used the millions of dollars of misappropriated client funds for a host of improper purposes, including: (i) his own personal use; (ii) paying EIA employees exorbitant salaries;

4

(iii) making payments to former clients who had complained about EBERHARD's fraudulent conduct in order to prevent those clients from reporting his conduct to law enforcement or securities regulatory authorities; and (iv) paying certain individuals to prevent them from acting on threats to expose EBERHARD's fraudulent conduct to law enforcement, and from exposing to EBERHARD's wife the fact that EBERHARD was engaged in intimate relationships with other women. Finally, in order both to promote his fraudulent conduct and conceal it from his clients, EBERHARD made materially false statements and misrepresentations to clients, including by providing false and fraudulent explanations for the activity within their accounts and by providing them with fabricated account statements.

### The "Churning" of Client Accounts

7.    TODD M. EBERHARD earned commission income through his trading activity in client accounts. EBERHARD's commissions were calculated by agreement with the broker-dealer with which EBERHARD maintained his clients' accounts. The amount of money EBERHARD received in commissions was determined based on the volume and nature of transactions he conducted in client accounts. Typically, the more trades EBERHARD conducted, the higher the commissions were that he received. Between in or about November 1998 and December 2001, for example, EBERHARD

earned an average of approximately $400,000 per month in
commissions from the combined trading in his clients' accounts.

8.    As commonly understood in the securities industry,
the term "churning" refers to a pattern of excessive and
unsuitable trading conducted by a broker with discretion over a
client's account, or caused by a broker's bad faith
recommendations to a client, for the purpose of generating
commissions for the broker.  Often, but not always, churning is
accomplished by selling positions that have increased slightly
and the broker usually justifies such sales by explaining the
need for the client to realize profits.

9.    From at least in or about 1993 up to and including
on or about February 5, 2003, TODD M. EBERHARD exercised
investment discretion over various of his clients' accounts, and,
on behalf of these clients, bought and sold securities, including
shares of mutual funds.  In some instances, the clients knowingly
provided EBERHARD with discretionary authority, permitting him to
purchase and sell securities in their accounts, without prior
approval of the client.  In a number of instances, however,
EBERHARD improperly exercised discretion over client funds by
forging client signatures on forms granting him such discretion.
In other cases, EBERHARD simply exercised discretion over
accounts without the appropriate authority, or appearance of
authority, to do so.  EBERHARD exercised discretion over client

6

accounts notwithstanding that such discretionary accounts were
not permitted by the rules of certain broker-dealers with which
EIA was affiliated, including CSA.

      10.   At all times relevant to this Indictment, TODD M.
EBERHARD engaged in excessive and inappropriate trading in his
clients' accounts, in other words "churning," which caused him to
earn excessive commissions, fees and other compensation, and
caused substantial losses in his clients' accounts.  EBERHARD
conducted his most excessive churning in client accounts with the
most funds; however, even accounts with relatively low balances
were churned.  EBERHARD churned not only personal investment
accounts but also trust accounts and Individual Retirement
Accounts.  Over time, as EBERHARD's client base grew, and as
EBERHARD's financial obligations grew - including, as set forth
more fully below, his obligations to repay clients in whose
accounts he had engaged in fraudulent activity - EBERHARD's
churning became more extensive.

      11.   One way in which TODD M. EBERHARD maximized the
benefit he personally received from churning his clients'
accounts was to engage in the inappropriate buying and selling of
"Class B Shares" of mutual funds.  Class B Shares typically carry
high "back-end loads," i.e., the owner is required to pay a
substantial fee, which determines, in part, the broker's
commission, upon the sale of the mutual fund.  These back-end

loads, which can be as high as seven percent of the value of the investment, typically decline over time. Consequently, investments in Class B Shares are designed for long-term investment strategies, such as retirement accounts. Because of the high transaction costs associated with their premature sale, Class B Shares are generally viewed within the securities industry as an unsuitable vehicle for active trading. EBERHARD frequently engaged in short-term transactions in Class B Shares of mutual funds on behalf of his clients, which, as he well knew, were intended solely to earn commissions for himself to the detriment of his clients, and were in violation of his fiduciary duties to his clients.

### The Misappropriation of Client Funds

12.    In addition to depleting client accounts through churning, TODD M. EBERHARD, together with others known and unknown, misappropriated money directly from client accounts by transferring funds from the account of one client to the account of another, or from client accounts to accounts in which EBERHARD had a beneficial interest. EBERHARD made and directed these transfers and withdrawals without the authorization of his clients, knowing that he did not have authorization to do so, and in violation of his fiduciary duties to his clients.

13.    One common method TODD M. EBERHARD used to effectuate the unauthorized transfer of client funds between

8

unrelated accounts was to direct other EIA employees to forge the
signatures of the clients on letters purportedly requesting and
authorizing the movement of funds.  EBERHARD typically made
unauthorized transfers of funds from one client account to
another in order to cover shortfalls in client accounts caused by
EBERHARD's churning and theft.

      14.    Another method used by TODD M. EBERHARD to steal
client funds was the following:

      a.    EBERHARD would prepare, or direct that an EIA
employee prepare, a letter purporting to bill a client a
percentage of that client's total holdings as a fee for
EBERHARD's management services.  In truth and in fact, and as
EBERHARD well knew, these clients paid for his services through
commissions generated by trading, and not through management
fees.  At EBERHARD's direction, the purported "bill" for his
services would merely be placed in the client's EIA file and
never be sent to the client.

      b.    EBERHARD would direct that an EIA employee
transmit a letter to EIA's affiliated broker-dealer purporting to
have been signed by a client directing that a check be issued in
the amount specified in the fraudulent management fee "bill,"
made payable to the Eberhard-controlled shell company, Powell
Transactions.  In truth and in fact, as EBERHARD well knew, the
signature of the client purportedly authorizing the payment of

funds to Powell Transactions was forged by EBERHARD or, at EBERHARD's direction, by another EIA employee.

        c.    EBERHARD, or an EIA employee acting at his direction, would deposit the check issued by the broker-dealer for the bogus management fee into EBERHARD's Powell Transactions bank account.

### EBERHARD'S Use of Client Funds Converted Through Churning and Theft

        15.    TODD M. EBERHARD used the funds he obtained fraudulently from his clients – through the massive churning and looting of accounts – for a variety of improper purposes.  As set forth below, EBERHARD used these funds: (1) for his own personal use, including taking a large monthly draw, causing large cash payments to be made to himself, and paying personal expenses charged on his corporate credit card; (2) paying EIA employees exorbitant sums for performing largely clerical tasks as a means of ensuring their continued participation in the fraudulent conduct set forth above; (3) paying large sums to settle complaints with clients who threatened legal action against EBERHARD based on his fraudulent conduct; and (4) paying former EIA employees who demanded payments in exchange for agreeing not to (i) report his fraudulent conduct to law enforcement or securities regulatory agencies, and (ii) report to EBERHARD's wife the fact that he was having intimate relationships with women other than his wife.

### Personal Use of Misappropriated Funds

16.   TODD M. EBERHARD used the fraudulent proceeds to, among other things, purchase real estate in Manhattan for his own use and the use of his family; purchase or lease expensive vehicles, including a Hummer and a BMW; maintain a chauffeured car for his personal use; and make personal real estate investments across the United States and abroad, including the purchase of an island in Nova Scotia, Canada.

### Use of Misappropriated Funds To Maintain Employment of Conspirators

17.   TODD M. EBERHARD employed several other persons at EIA, some of whom were aware of and, at EBERHARD's direction, participated in and knowingly took steps to further his fraudulent scheme.  Among the acts that EBERHARD directed these employees to perform were: (1) making unauthorized journals of funds from one client's account to the account of an unrelated client; (2) making unauthorized wire transfers from client accounts; (3) distributing false or doctored account statements; (4) negotiating settlement agreements with clients requiring the clients to forego filing claims with NASD; and (5) forging client signatures, including on letters causing the issuance of checks from client accounts.  In order to ensure these EIA employees' continued participation in the fraudulent activity, and to obtain their tacit agreement not to report his fraudulent conduct, EBERHARD paid exorbitant salaries to employees that were far

11

above market rate for the services provided.  For example, one co-conspirator not named as a defendant herein, who by 2001 was a part-time EIA employee, was responsible for processing trades made by EBERHARD, such as calling trades in to EIA's broker-dealer and maintaining records of such transactions in EIA's files.  As of in or about November 2001, that co-conspirator's annual salary was approximately $180,000, not including the large cash bonuses also typically awarded by EBERHARD.

### Use of Funds to Repay Defrauded Clients and Prevent Them From Exposing The Fraudulent Scheme

18.  At various times relevant to this Indictment, certain clients discovered TODD M. EBERHARD's fraudulent conduct and confronted him.  In several instances, EBERHARD entered into agreements in which he paid clients sums of money to compensate them for losses he caused.  However, in order to conceal his fraudulent conduct from law enforcement as well as other clients, EBERHARD required that clients who accepted settlement payments agree to refrain from notifying the authorities of his conduct or to otherwise publicize the fact that a settlement had been made.

19.  From in or about 1999 through in or about 2003, TODD M. EBERHARD entered into agreements to make payments totaling in excess of approximately $4.5 million to clients. These payments were made via lump sums or, more typically, in monthly installments.  Many of these payments, as set forth

12

above, were made with funds misappropriated from other client accounts.

20.   As TODD M. EBERHARD well knew, he was required to report these settlements to NASD.  However, EBERHARD purposely and knowingly failed to make the required notification in order to conceal his fraudulent conduct from both securities regulatory and law enforcement authorities, as well as from his other clients who had not yet discovered his fraudulent activity.

**Use of Misappropriated Funds to Pay Extortion Demands**

21.   TODD M. EBERHARD also used misappropriated investor funds to pay Jeff Zisselman ("Zisselman"), a former EIA employee and co-conspirator not named as a defendant herein, who had threatened to disclose EBERHARD's criminal activities to law enforcement authorities and his marital infidelities to his wife. EBERHARD's payments to Zisselman, which were funded largely through the proceeds of EBERHARD's fraudulent scheme, arose as follows:

(a)  In or about January 2002, Brian Mercier ("Mercier"), a co-conspirator not named as a defendant herein and an EIA employee responsible for book-keeping and management of EIA's operational bank account, communicated Zisselman's threats to EBERHARD;

(b)   Mercier communicated to EBERHARD that
Zisselman had demanded that EBERHARD pay Zisselman a large sum of
money to avoid the threatened disclosures;

(c)   In connection with Zisselman's threat, at
Zisselman's direction, Mercier delivered to EBERHARD a hand-
written list of clients in whose accounts EBERHARD engaged in
fraudulent activity;

(d)   Also at Zisselman's direction, Mercier
presented EBERHARD with a bound notebook, compiled by Zisselman,
bearing the title "My True Life."  "My True Life" was comprised
principally of e-mails exchanged between EBERHARD and various
women, which established that EBERHARD had had intimate
relationships with them;

(e)   EBERHARD agreed to pay Zisselman the "hush
money" demanded, including several hundred thousand dollars up
front and approximately $100,000 per month thereafter;

(f)   On or about January 9, 2002, at EBERHARD's
direction, Mercier used his authority over EIA's operational bank
account to wire approximately $450,000 from that account to
Zisselman;

(g)   Thereafter, from in or about February 2002
through in or about January 2003, on a monthly basis, Mercier, at
EBERHARD's direction, wired Zisselman approximately $100,000 from
EIA's account;

14

(h) Unbeknownst to EBERHARD, Zisselman had agreed to split the proceeds of the extortion scheme with Mercier. Pursuant to this agreement, within days of receiving payments from EIA, Zisselman distributed to Mercier approximately half of the proceeds he had received; and

(i) By the time of EBERHARD's February 2003 arrest on federal securities law charges, EBERHARD had paid Zisselman approximately $1.55 million in hush money. Zisselman, in turn, had paid Mercier approximately $750,000, or roughly half of the extortion proceeds.

### False Statements to Clients To Further and Conceal The Fraudulent Scheme

22. TODD M. EBERHARD, together with others known and unknown, made numerous materially false statements and misrepresentations to clients designed to: (a) persuade clients to entrust and continue to entrust funds to EBERHARD for management; (b) hide his churning and looting of their accounts; (c) prevent clients from withdrawing funds and/or terminating their investment advisory relationships with EBERHARD; and (d) prevent clients from pursuing civil remedies for their losses, reporting EBERHARD's conduct to authorities or otherwise publicizing EBERHARD's fraudulent activity.

23. TODD M. EBERHARD's materially false statements and misrepresentations primarily took the following forms: (1) oral and written statements designed to conceal the depletion of funds

within client accounts and the true reason for such depletion;
(2) creation and issuance of fraudulent account statements which
reflected inflated balances; and (3) preventing accurate account
statements prepared by independent securities broker-dealers
which reflected EBERHARD's fraudulent activity from being sent to
clients.

### EBERHARD's Oral and Written False Statements Providing Explanations For His Abuse of Client Accounts

24.  At all times relevant to this Indictment, TODD M.
EBERHARD's clients received account statements and other
documents directly from securities broker-dealers with which
either EIA or Park South maintained relationships, and, as
EBERHARD well knew, these account statements and other
documentation accurately reflected the activity within their
accounts, including the impact of EBERHARD's fraudulent
activities.

25.  To conceal the effects of his frauds on his
clients' financial situations, TODD M. EBERHARD made numerous
material misrepresentations and false statements to his clients,
both orally and in writing, designed to mislead investors into
believing that these account statements did not accurately
reflect the activity within the accounts or the balances in the
accounts.  Among EBERHARD's material misrepresentations and false
statements were the following:

16

a.  Receipt of an inordinate number of trade
confirmations did not indicate that there had been excessive
trading in a client's account, because the trades had been placed
on a "good until canceled" basis, and most of the trades for
which the client received confirmations had in fact been
canceled.  In truth and in fact, as EBERHARD well knew, the
accounts had been excessively traded and the trades reflected by
trade confirmations had not in fact been canceled;

b.  The balance in the client's account set forth
in the account statement sent by the clearing firm did not
reflect the entirety of the client's funds under management by
EBERHARD, because some of the client's funds were invested
elsewhere and not included on the account statement.  In truth
and in fact, as EBERHARD well knew, these investors had no
investments with EIA other than those contained in the clearing
firm statements, and the funds in the clients' accounts were
lower than expected due to EBERHARD's churning of the account and
other misuse of the funds;

c.  In order to calculate the true value of an
account, the client had to add the value of "trades not settled"
to the balance listed on monthly account statements.  In truth
and in fact, as EBERHARD well knew, the value of any "trades not
settled" was already reflected in the balance listed on the
account statements and, therefore, that balance accurately stated

17

the true financial position of the client, which was lower than the client expected due to EBERHARD's churning of the account and other misuse of the funds; and

d.    Checks drawn from client accounts or other transfers to third parties not authorized by the client were done by accident or mistake.  In truth and in fact, EBERHARD purposefully and knowingly made, and caused others known and unknown to make, these improper withdrawals and transfers.

### EBERHARD's Fabrication of Fraudulent Account Statements

26.    In addition to making oral and written misrepresentations regarding genuine account statements issued by independent securities broker-dealers, TODD M. EBERHARD, together with others known and unknown, also defrauded investors by creating and providing to clients fraudulent account statements reflecting artificially high account balances.  EBERHARD and his co-conspirators utilized two principal types of false account statements: (1) fabricated statements issued directly by EIA and (2) statements generated by the clearing broker or other financial institution which were subsequently altered by EBERHARD and others acting at his direction.

27.    With respect to the EIA-generated false account statements, EBERHARD, and others known and unknown, inflated the value of the client's investment portfolio by making false entries in EIA's investment tracking software including, for

18

example, changing the market value of securities held by the client. EBERHARD, and EIA employees acting at his direction, would then simply print an account statement from EIA's computer system, usually on EIA letterhead, reflecting the artificially high account balance created through the use of the false computer entries.

28. TODD M. EBERHARD, and others known and unknown, would also, through a variety of means, alter third-party account statements to reflect artificially high account balances. For example, EBERHARD, and EIA employees acting at his direction, would literally cut and paste the name and address of a client with a low account balance onto the account statement of another client with a higher account balance. In addition, EBERHARD, and others known and unknown, would manually alter the balance or other financial information on a correct account statement before transmitting it to a client.

### EBERHARD's Fraudulent Alteration of the Mailing Address of Client Accounts

29. Another means by which TODD M. EBERHARD, and others known and unknown, concealed his fraudulent activity was, acting without authorization from his clients and in breach of his fiduciary duties to them, to change the clients' addresses of record at the broker-dealer which issued account statements so that the clients simply would not receive account statements during periods in which EBERHARD looted their accounts.

Specifically, EBERHARD, and EIA employees acting at EBERHARD's direction, changed the address of record from the client's address to the address of EBERHARD's residence, or to the residence of another EIA employee, without the client's knowledge or authorization.   In at least one instance, when questioned by the client about why the client had not received account statements, EBERHARD lied to the client and falsely represented that no statements had been issued during that period.   In truth and in fact, as EBERHARD well knew, account statements had been issued, and had been sent to EBERHARD's residence rather than to the client's.

### EBERHARD's Continued Attempts to Conceal His Fraudulent Conduct From Regulators, Obstruct The SEC Investigation and Retain Proceeds of His Fraud

30.   In or about February 2003, the United States Securities and Exchange Commission ("SEC") sued TODD M. EBERHARD and his affiliated entities and obtained a temporary restraining order.   In connection with the SEC's action, the United States District Court for the Southern District of New York ordered that EBERHARD provide a list of all assets belonging to EBERHARD and his affiliated entities, and that all such assets be frozen so that they could be preserved for later distribution to victims of his fraud (the "Freeze Order").

31.   In order to provide an innocent explanation for his theft of funds from certain victims, to obstruct the SEC's

20

investigation and action against him, and to obtain access to

funds that otherwise should have been subject to the Freeze

Order, TODD M. EBERHARD, together with others known and unknown,

created and submitted fraudulent documentation to the SEC.

32.    In or about April 2003, TODD M. EBERHARD, together

with others known and unknown, created a document (the

"Document") which purported to transfer EBERHARD's interest in

certain real property located in Atlanta, Georgia (the "Atlanta

Property") to certain clients (the "Clients") as well as to

EBERHARD's sister.    The Document also expressly provided that any

income derived from the Atlanta Property could be used "by Todd

Eberhard at his sole discretion for any need or desire."

According to the Document, the transfer of the Atlanta Property

became effective on or about April 2, 2000, and the Document

purported to be executed and notarized on the same day.

33.    In truth and in fact, TODD M. EBERHARD, together

with others known and unknown, including EBERHARD's mother and

the Clients, all of whom had purportedly signed the Document on

or about April 2, 2000, created the Document in or about 2003,

and falsely represented that the Document had been executed and

signed in or about 2000.    Indeed, the individual who purportedly

notarized the Document is in fact related to, although does not

share the same last name as, EBERHARD.

34.  As EBERHARD well knew, he had previously defrauded the Clients and stolen their money.  Thus, in order to (1) deceive the Clients from recognizing the depletion of their funds (2) prevent them from aiding the investigation of the SEC, and (3) deter the Clients from participating in procedures established for victims to recover lost funds, EBERHARD convinced the Clients to sign the Document purportedly transferring the Atlanta Property to them.  At the same time, EBERHARD, together with others known and unknown, told the Clients not to assert publicly that EBERHARD had defrauded them and took their money, and instead instructed them to assert that they had received the Atlanta Property in or about April 2000 – and executed the Document contemporaneously – pursuant to the terms set forth in the Document.  In accord with the instructions of EBERHARD, and others known and unknown, the Clients filed documents with the Court and with a Receiver appointed by the Court asserting an interest in the Atlanta Property.

## THE CONSPIRACY

35.  From at least in or about 1993, up to and including on or about February 5, 2003, in the Southern District of New York and elsewhere, TODD M. EBERHARD, together with others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to

violate Title 15, United States Code, Sections 80b-6 and 80b-17
and Title 18, United States Code, Sections 1341, 1343 and 1346.

### Objects of the Conspiracy

### Investment Adviser Fraud

36.    It was a part and an object of the conspiracy
that TODD M. EBERHARD, and others known and unknown, unlawfully,
willfully, and knowingly would and did, by use of the mails and
of other means and instrumentalities of interstate commerce,
directly and indirectly: (i) employ devices, schemes, and
artifices to defraud clients; (ii) engage in transactions,
practices, and courses of business which operated as a fraud and
deceit upon clients; and (iii) engage in acts, practices, and
courses of business which were fraudulent, deceptive, and
manipulative, in violation of Title 15, United States Code,
Sections 80b-6 and 80b-17.

### Wire Fraud

37.    It was a further part and object of the conspiracy
that TODD M. EBERHARD, and others known and unknown, unlawfully,
willfully, and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations and promises would and did transmit and cause to
be transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,

23

signs, signals, pictures, and sounds for the purpose of executing

such scheme and artifice, in violation of Title 18, United States

Code, Sections 1343 and 1346.

### Mail Fraud

38.    It was a further part and object of the

conspiracy that TODD M. EBERHARD and others known and unknown,

unlawfully, willfully and knowingly, having devised and intending

to devise a scheme and artifice to defraud and for obtaining

money and property by means of false and fraudulent pretenses,

representations and promises, for the purpose of executing such

scheme and artifice and attempting so to do, would and did place

and cause to be placed in post offices and authorized

depositories for mail matter, matters and things to be delivered

by the Postal Service, and would and did deposit and cause to be

deposited matters and things to be sent and delivered by private

and commercial interstate carrier, would and did take and receive

therefrom such matters and things, and would and did cause to be

delivered by mail and such carrier according to the direction

thereon such matters and things, in violation of Title 18, United

States Code, Sections 1341 and 1346.

### The Means and Methods of the Fraudulent Scheme

39.    Among the means and methods by which TODD M.

EBERHARD and his co-conspirators would and did carry out the

conspiracy were the following:

a. EBERHARD made false statements about himself, including representing falsely that he had served in the U.S. military as a Navy SEAL;

b. EBERHARD made false statements about EIA and its affiliated entities, including that EIA had over $2 billion in assets under management;

c. EBERHARD lulled victims by telling them that he considered them part of his family;

d. EBERHARD placed securities trades in client accounts in order to generate commissions for himself and which were not in the best interest of his clients;

e. EBERHARD disregarded explicit client instructions regarding the nature of investments he was to make on their behalf;

f. EBERHARD traded in client accounts after being instructed to cease trading;

g. EBERHARD terminated his relationship with broker-dealers that scrutinized or questioned his trading practices;

h. EBERHARD bought and sold "Class B Shares" of mutual funds for his clients in order to increase fees and commissions payable to him and entities he controlled;

i.  EBERHARD made false statements and representations to clients over the telephone and in meetings regarding the activity in their accounts;

j.  EBERHARD created and provided false and misleading account statements to clients;

k.  EBERHARD directed that EIA employees journal money between unrelated client accounts;

l.  EBERHARD directed that checks be written against client accounts, made payable to accounts EBERHARD owned or controlled, and delivered to his home;

m.  EBERHARD changed client addresses with affiliated broker-dealers and/or clearing firms so that monthly statements would be mailed not to the client but to EBERHARD's home or the home of another EIA employee;

n.  EBERHARD forged or directed that EIA employees forge client signatures;

o.  EBERHARD entered into written settlement agreements with clients requiring that clients keep the fact of the settlement secret;

p.  EBERHARD failed to report to NASD the fact that he had made payments to clients and former clients to compensate them for the losses he caused;

q.    EBERHARD used client funds to pay extortion demands involving his fraudulent conduct and his extramarital affairs;

r.    EBERHARD advised clients to borrow money rather than use funds on deposit or liquidate securities positions;

s.    EBERHARD created false documents in order to conceal his fraudulent conduct from the SEC;

t.    EBERHARD used and employed the means and instrumentalities of interstate commerce, including interstate wires and the mails.

### Overt Acts

40.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York, and elsewhere:

a.    On or about April 7, 1995, at EIA's New York, New York office, EBERHARD directed two EIA employees to forge client signatures on a letter directing that an approximately $400,000 check from the account of the clients be issued to Powell Transactions;

b.    On or about October 2, 2001, EBERHARD caused a fax to be sent from EIA's office in New York, NY to Stark Investments, Ltd. in Milwaukee, Wisconsin a confirming wire

27

transfer of approximately $167,085 from the account of an EIA client;

   c.   On or about October 18, 2001, EBERHARD caused an approximately $24,200.00 check from the account of a client to be deposited into an EIA bank account located in New York, New York.

   d.   In or about December 2001, EBERHARD executed a settlement agreement with a client, in which he agreed to pay approximately $2 million, principally in monthly payments of approximately $100,000, and which contained a provision restraining the client from disclosing EBERHARD's conduct to authorities;

   e.   On or about December 27, 2001, EBERHARD directed that a check be issued from the account of a client in the amount of approximately $30,000, payable to Dime Savings Bank;

   f.   In or about June 2002, EBERHARD caused a client account statement to be sent by mail from CSC in Missouri to EBERHARD's residence in New York, New York.

   g.   On or about October 29, 2002, EBERHARD sent a letter to a client in New York, New York, falsely stating that no statements were issued for that client's account during a period in which the statements had in fact been sent to EBERHARD's own residence at his direction;

28

h.   On or about January 13, 2003, EBERHARD met with a client in New York, New York, and provided a false account statement to the client;

i.   On or about January 23, 2003, a fraudulent account statement was sent to a client in New York, New York by fax from EIA's office in New York, New York;

j.   In or about April 2003, EBERHARD executed a document which falsely purported to have transferred real property from EBERHARD to certain former clients in or about 2000.

(Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH EIGHT

### (Investment Adviser Fraud)

The Grand Jury further charges:

41.   The allegations set forth in paragraphs 1 through 34 and 39 and 40 are repeated and realleged as if set forth fully herein.

42.   On or about the dates set forth below, TODD M. EBERHARD, in the Southern District of New York and elsewhere, unlawfully, willfully, and knowingly, by the use of the mails and of other means and instrumentalities of interstate commerce, directly and indirectly, did, as set forth above, (i) employ devices, schemes, and artifices to defraud clients; (ii) engage in transactions, practices, and courses of business which

29

operated as a fraud and deceit upon clients, and (iii) engage in acts, practices and courses of business which were fraudulent, deceptive and manipulative, on clients of EBERHARD and EIA as set forth below.

| Count | Approximate Dates Client Maintained Account(s) with EBERHARD | Client |
|-------|-------------------------------------------------------------|--------|
| 2 | December 1991 - February 2002 | Victim 1 |
| 3 | April 1999 - February 2003 | Victim 2 |
| 4 | March 2000 - February 2003 | Victim 3 |
| 5 | August 2000 - June 2001 | Victim 4 |
| 6 | December 2000 - February 2003 | Victim 5 |
| 7 | February 2001 - February 2003 | Victim 6 |
| 8 | June 2001 - June 2003 | Victim 7 |

(Title 15, United States Code, Sections 80b-6 and 80b-17;
Title 18, United States Code, Section 2.)

### COUNTS NINE THROUGH ELEVEN

#### (Wire Fraud)

The Grand Jury further charges:

43.  The allegations set forth in paragraphs 1 through 34 and 39 and 40 are repeated and realleged as if set forth fully herein.

44.  On or about the dates set forth below, TODD M. EBERHARD, in the Southern District of New York and elsewhere, unlawfully, willfully, and knowingly, having devised and

intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, namely the scheme set
forth above, did transmit and cause to be transmitted by means of
wire, radio, and television communication in interstate commerce,
writings, signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, EBERHARD, together
with others known and unknown, transmitted or caused to be
transmitted the following interstate wire communications, from
EIA's offices in New York, New York:

| Count | Approximate Date | Wire |
|-------|------------------|------|
| 9 | Oct. 2, 2001 | Fax from EIA in New York, NY to Stark Investments, Ltd. in Milwaukee, Wisconsin confirming wire transfer of approximately $167,085 from EIA account of Victim 5 |
| 10 | Apr. 10, 2002 | Wire transfer of approximately $100,000 from EIA's operational account in New York to account in California. |
| 11 | Dec. 20, 2002 | Wire transfer instructions sent from EIA in New York, New York, to CSC in New Jersey directing transfer of approximately $250,000 from client account of Victim 2. |

(Title 18, United States Code, Sections 1343 and 1346, and 2).

### COUNTS TWELVE THROUGH FOURTEEN

#### (Mail Fraud)

The Grand Jury further charges:

45.    The allegations set forth in paragraphs 1 through 34 and 39 and 40 are repeated and realleged as if set forth fully herein.

46.    On or about the dates set forth below, TODD M. EBERHARD, in the Southern District of New York and elsewhere, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, namely the scheme set forth above, for the purpose of executing such scheme or artifice or attempting so to do, placed and caused to be placed in post offices and authorized depositories for mail matter, matters and things to be delivered by the Postal Service, and deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carrier, and took and received therefrom such matters and things, and caused to be delivered by mail and such carrier according to the direction thereon such matters and things, to wit, on or about the dates set forth below, EBERHARD caused account statements of Victim 3 to be mailed to EBERHARD's home, rather than to Victim 3:

32

| Count | Approximate Date | Mailing |
|-------|------------------|---------|
| 12 | May 2002 | Client Account Statement Sent From CSC in Missouri to EBERHARD's residence in New York, New York |
| 13 | June 2002 | Client Account Statement Sent From CSC in Missouri to EBERHARD's residence in New York, New York |
| 14 | July 2002 | Client Account Statement Sent From CSC in Missouri to EBERHARD's residence in New York, New York |

(Title 18, United States Code, Sections 1341 and 1346, and 2).

<u>COUNT FIFTEEN</u>

**(Witness Tampering)**

The Grand Jury further charges:

47.   The allegations set forth in paragraphs 1 through 34 and 39 and 40 are repeated and realleged as if set forth fully herein.

48.   From in or about February 2003 through in or about May 2003, in the Southern District of New York, TODD M. EBERHARD, corruptly persuaded other persons, and attempted to do so, and engaged in misleading conduct toward such other persons, intending to influence, delay, and prevent the testimony of such

33

persons in an official proceeding and to hinder, delay, and

prevent the communication to a law enforcement officer and judge

of the United States of information relating to the commission

and possible commission of a Federal offense and a violation of

conditions of release pending judicial proceedings, to wit,

EBERHARD corruptly persuaded two former EIA clients (Victims 19

and 20) to falsely claim in connection with an SEC lawsuit

pending in Federal Court in New York, New York and a criminal

investigation, that they had executed a document reflecting the

transfer of real property to them in or about April 2000.

(Title 18, United States Code, Sections 1512(b) and 2).

### COUNT SIXTEEN

#### (Obstruction of Justice)

The Grand Jury further charges:

49.  The allegations set forth in paragraphs 1 through

34 and 39 and 40 are repeated and realleged as if set forth fully

herein.

50.  From in or about February 2003 through in or

about May 2003, in the Southern District of New York, TODD M.

EBERHARD, corruptly obstructed, influenced, and impeded an

official proceeding, and attempted to do so, to wit, EBERHARD

submitted a document to the SEC in connection with a lawsuit

pending in Federal Court in New York, New York, falsely

reflecting that he had executed the document, purportedly

34

transferring his interest in certain real property, on or about April 2, 2000.

(Title 18, United States Code, Sections 1512(c) and 2).

### SUPPLEMENTAL ALLEGATIONS TO COUNTS ONE THROUGH SIXTEEN

The Grand Jury further charges:

51.   With respect to Counts One through Eight, the offense involved a violation of securities laws and, at the time of the offense, EBERHARD was a registered broker-dealer, or a person associated with a broker dealer, or an investment adviser, or a person associated with an investment adviser.

52.   With respect to Counts One through Sixteen, the loss exceeded $20,000,000.

53.   The offenses charged in Counts One through Sixteen involved more than ten victims.

54.   The offenses charged in Counts One through Sixteen involved sophisticated means.

55.   In carrying out the offenses charged in Counts One through Sixteen, TODD M. EBERHARD abused a position of private trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offenses.

56.   In committing the offenses charged in Counts One through Sixteen, TODD M. EBERHARD was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

35

57.    TODD M. EBERHARD willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the course of the investigation and prosecution of the offenses charged in Counts One through Sixteen, and the obstructive conduct related to the offenses charged in Counts One through Sixteen and relevant conduct to those offenses.

_____
FOREPERSON

_____
DAVID N. KELLEY
United States Attorney for the
Southern District of New York

36